UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
DEUTSCHE BANK AG,                       :
                                        :
                 Plaintiff,             :
                                        :    04 CIV. 5594 (DLC)
        -v-                             :
                                        :       OPINION
AMBAC CREDIT PRODUCTS, LLC and AMBAC    :      and ORDER
ASSURANCE CORPORATION,                  :
                                        :
                 Defendants.            :
                                        :
----------------------------------------X

Appearances:

For plaintiff:
Theodore D. Aden
Epstein Becker & Green, P.C.
250 Park Avenue
New York, NY 10177

For defendants:
David W. Dykhouse
Philip R. Forlenza
Patterson, Belknap, Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036-6710


DENISE COTE, District Judge:

        This is a dispute over a complex transaction between two
sophisticated financial institutions.  Although the instruments
involved are somewhat abstruse, the central issue can be boiled
down to a relatively straightforward question of contract
interpretation: When was plaintiff Deutsche Bank AG ("DB")
required to deliver a group of bonds to defendant Ambac Credit
Products, LLC ("ACP")?  DB claims that although the documents

governing the disputed transaction set out a detailed timeline for delivery of the bonds, industry practice and other contractual provisions allowed for delivery well past the nominal deadline.  Therefore, according to DB, ACP breached the contract when it refused to pay for the bonds DB tendered one month after the putative delivery date.

A bench trial was held on June 26, 27, and 29.  This Opinion presents the Court's findings of fact and conclusions of law and concludes that ACP did not breach its contract with DB, since it was under no obligation to pay for bonds that were not delivered in accordance with the contractual terms.  As a result, DB's common law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and equitable estoppel fail.

Procedural History

DB filed this action on July 19, 2004, alleging breach of contract against defendants ACP and Ambac Assurance Corporation ("AAC").[1]  After the completion of fact discovery, defendants

---

[1] AAC is a subsidiary of Ambac Financial Group, Inc. ("Financial"), an American monoline insurance company.  Financial is not a defendant in this action.  It is the parent company, however, of defendant AAC.  AAC, in turn, is the parent company of defendant ACP.  AAC issues financial guarantees and loss indemnity policies, and AAC engages in credit derivative transactions.  ACP does not have officers and employees distinct from the officers and employees of AAC.

filed a motion for summary judgment or to bar DB from introducing
evidence of industry custom.  The motion was denied in a
Memorandum Opinion of August 22, 2005.  Deutsche Bank AG v. AMBC
Credit Products, LLC, No. 04 Civ. 5594 (DLC), 2005 WL 2033379
(S.D.N.Y. Aug. 22, 2005).  On November 15, 2005, DB filed its
first amended complaint, adding two claims against ACP: (1)
breach of the implied covenant of good faith and fair dealing,
and (2) equitable estoppel.  On February 15, 2006, DB filed a
second amended complaint, augmenting its breach of contract
claims.

Trial Procedure

     The trial was conducted without objection in accordance with
the Court's customary practices for the conduct of non-jury
proceedings.  The parties submitted a Joint Pretrial Order and
proposed findings of fact and conclusions of law on June 12,
2006.  The parties also served affidavits containing the direct
testimony of their witnesses, as well as copies of all the
exhibits and deposition testimony that they intended to offer as
evidence in chief at trial.

     With its Pretrial Order submissions, plaintiff presented
declarations constituting the direct testimony of Kenneth
Brougher ("Brougher"), vice president of Deutsche Bank
Securities, Inc., a subsidiary of DB; Steven Horn ("Horn"),

3

director of Deutsche Bank Securities, Inc.; Boaz Weinstein
("Weinstein"), head of credit trading for the Americas in DB's
New York branch; Roman Shukhman, a trader on the credit
derivatives desk at JP Morgan Chase ("JPMC"); Mei-Mei Sandy Wong,
a member of JPMC's settlement group; and Lisa Sloan ("Sloan"),
former chief administrative officer and director of operations
for M. Safra & Co., a hedge fund manager.  With the exception of
Shukman, who defendants chose not to cross-examine, each of these
witnesses appeared at trial and was cross-examined.

Defendants offered the testimony of Peter Campbell
("Campbell"), the manager of Financial's treasury operations
group; Thomas Gandolfo, chief financial officer of Financial and
its subsidiaries during the relevant period; David Gleeson
("Gleeson"), an accountant for Financial's credit derivatives
business line during the relevant period; Cynthia Parker
("Parker"), managing director for credit derivatives for
Financial and its subsidiaries; Douglas Renfield-Miller, senior
managing director of AAC during the relevant period; David
Weissman, a senior executive at AAC and ACP; Joseph Swain
("Swain"), a senior officer of Assured Guaranty Corporation
("Assured"); and M. Holland West ("West"), a former partner at
Shearman & Sterling LLP and former head of its global derivative,
hedge fund, structured finance, and private equity practices.
Each of these witnesses appeared at trial and was cross-examined.

4

Excerpts from the depositions of testifying witnesses, as well as the following individuals, were offered and received into evidence at trial.  Plaintiffs offered excerpts from the depositions of Kirk Ballard ("Ballard"), a senior analyst covering North American settlements for DB; David Barranco, an employee of Financial; and Maria Ruf, a back office clerk for DB in the international bond market during the relevant period. Defendants offered excerpts from the depositions of Ballard; Ruff; and Ernest Goodrich, Jr., managing director and senior counsel in DB's credit derivatives business.

## FINDINGS OF FACT

The disputed transaction here is a species of credit derivative called a credit default swap ("CDS").  Credit derivatives are akin to insurance policies for holders of corporate bonds or other securities against downgrades in the credit of the issuing companies.  They do this by transferring credit risk from a "protection buyer" to a "protection seller."[2] A CDS is a common type of credit derivative in which the protection buyer makes a fixed payment to the protection seller in return for a payment that is contingent upon a "credit event" -- such as a bankruptcy -- occurring to the company that issued

---

[2] A credit derivative is a synthetic instrument, however, and not all purchasers of such "protection" actually own the security covered by the transaction.

the security (the "reference entity") or the security itself (the "reference obligation").  The contingent payment is often made against delivery of a "deliverable obligation" -- usually the reference obligation or other security issued by the reference entity -- by the protection buyer to the protection seller.  This delivery is known as the "physical settlement."[3]  Some CDS transactions, such as the one at issue here, are known as "portfolio" transactions, meaning they cover multiple reference entities and reference obligations.

    CDS transactions are of relatively recent origin, having been developed in the mid-1990s.  They are highly negotiated and are customarily based on standard terms published by the International Swaps and Derivatives Association, Inc. ("ISDA").  These terms may be modified for a particular transaction.  At the time the transaction at issue here was executed, the 1999 ISDA Credit Derivatives Definitions ("1999 Definitions") provided the foundation for most CDS agreements.

    The 1999 Definitions, which contemplate a transaction involving a single reference obligation, set out a highly detailed, carefully choreographed set of procedures to be followed if the reference entity experiences a credit event.  First, pursuant to Section 3.3, either party may notify the other

---

[3] The parties can sometimes settle transactions without a transfer of securities.  This is known as a "cash settlement" and is not at issue here.

6

party of the credit event by means of an irrevocable Credit Event

Notice, containing "a description in reasonable detail of the

facts relevant to the determination that a Credit Event has

occurred." Once the Credit Event Notice has been provided, the

buyer of protection has 30 days to provide the seller with a

Notice of Intended Physical Settlement ("NIPS").[4] Under Section

3.4, NIPS

> means an irrevocable notice from Buyer ... to Seller
> that confirms that Buyer will settle the Credit
> Derivative Transaction and require performance in
> accordance with the Physical Settlement Method, and
> containing a detailed description of the type of
> Deliverable Obligations that Buyer reasonably expects
> to Deliver to Seller.

If a NIPS is not delivered within the 30-day window, the

transaction terminates, and the buyer loses its ability to make

any claim for credit protection. In the words of Section 3.4,

the "thirtieth calendar day shall be the Termination Date."

(Emphasis supplied.)

Assuming that a timely delivery of a NIPS has been made, the

parties must settle the transaction within the Settlement Period,

which is defined in Section 8.5 as:

> the number of Business Days specified as such in the
> related Confirmation or, if a number of Business Days
> is not so specified, the longest of the number of
> Business Days for settlement in accordance with then
> current market practice of any Deliverable Obligation

---

[4] In some cases, an associated document, known as a "Notice of Publicly Available Information" must also be delivered before the 30-day period begins to run.

> being Delivered in the Portfolio, as determined by the
> Calculation Agent, in consultation with the parties.

(Emphasis supplied.)  The reference to "current market practice"

allows the Calculation Agent to identify the delivery date that

is customary for the securities that are at issue.

The final day of the Physical Settlement Period is known as

the Physical Settlement Date, and under Section 8.1, it is the

date on which the parties' obligations to each other come due:

> <u>Buyer shall</u> ... <u>on or prior to the Physical Settlement</u>
> <u>Date Deliver to Seller</u> all or part of that portion of
> the Portfolio specified in the Notice of Intended
> Physical Settlement <u>and Seller shall pay to Buyer</u> that
> portion of the Physical Settlement Amount that
> corresponds to the portion of the Portfolio that Buyer
> has Delivered.

(Emphasis supplied.)  Thus, the seller's duty to pay is dependent

on the buyer of protection's delivery of the securities

identified in the NIPS.

Pursuant to Section 8.3, if delivery is completed by the

Physical Settlement Date, the transaction ends.  It provides that

"If the entire portion of the Portfolio specified in the Notice

of Intended Physical Settlement is Delivered on or before the

Physical Settlement Date, the Physical Settlement Date shall be

the <u>Termination Date</u>."  (Emphasis supplied.)

Section 9.3(c)(ii), however, loosens the requirement that

the buyer make delivery "on or prior to" the Physical Settlement

Date:

> Buyer may continue to attempt to Deliver the whole of

8

the Portfolio specified in the Notice of Intended
Physical Settlement <u>for an additional five Business
Days after the Physical Settlement Date</u>.  Subject to
Section 8.1 and to Sections 9.4, 9.5, 9.6 and 9.7, <u>if
Buyer fails to Deliver any portion of the Portfolio
specified in the Notice of Intended Physical Settlement
on or prior to the date that is five Business Days
after the Physical Settlement Date</u>, such failure shall
not constitute an Event of Default and <u>such date shall
be deemed to be the Termination Date</u>.

(Emphasis supplied.)  This provision creates a five-day grace
period for the delivery of deliverable obligations to account for
back-office delays in the procurement and delivery of securities.
If, however, the buyer fails to make delivery within that five-
day window, the transaction terminates, and the buyer loses its
ability to make any claim for credit protection.

Thus, once a credit event occurs, the parties have a
strictly controlled time-frame in which to act.  A buyer of
protection must first deliver a NIPS and then the securities
within the time frames allowed, or lose the right to obtain
payment from the protection seller.  Similarly, assuming the
buyer has performed its obligations, the seller of protection
must be prepared to make the required payment associated with the
credit event within a defined and relatively short period of time
following a credit event.


<u>The Triplets Transaction</u>

In the transaction that is the subject of this lawsuit, DB,
a large international bank headquartered in Germany, functioned

9

as the protection buyer, and ACP functioned as the protection
seller.  The parties entered into a Master Agreement dated
December 17, 1998, as well as a Schedule and Credit Support Annex
(collectively, the "Master Agreement").  AAC also issued a
Financial Guarantee Insurance Policy (the "Guarantee")
unconditionally and irrevocably guaranteeing "any payment of the
Cash Settlement Amount due from [ACP] to [DB] pursuant to the
terms of any confirmation under the Master Agreement."  The
Schedule provides that the Master Agreement will "be governed by,
and construed and enforced in accordance with, the laws of the
State of New York without reference to its choice of law
doctrine."

        ACP and DB then entered into a Confirmation dated April 19,
2000 issued under the Master Agreement ("Confirmation") and
relating to a CDS transaction known as "Triplets."  Triplets
involved a portfolio of 60 reference entities and reference
obligations, including 7.375% Bonds due in 2027, issued by
Solutia Inc. (the "Solutia Bonds").[5]  DB agreed to pay ACP at
regular intervals for the credit protection provided under the
Confirmation.  The Confirmation expressly incorporates the Master
Agreement, the Schedule, and the 1999 Definitions, including the

_____

        [5] Portfolio transactions were a relatively new addition to
the credit derivative market in 2000.  In fact, Triplets was one
of the first portfolio credit derivative transactions to which DB
had been a party.

right of either the protection buyer or seller to serve a Credit
Event Notice.  It states that "[i]n the event of any
inconsistency between the Credit Derivatives Definitions and this
Confirmation, this Confirmation will govern."

It was, in fact, necessary for the Confirmation to override
certain provisions of the 1999 Definitions, since Triplets
involved multiple reference entities and obligations, while the
1999 Definitions contemplated a single-name transaction.  For
example, under the 1999 Definitions, both completion of physical
settlement and failure to adhere to the physical settlement
timeline end the entire transaction.  Here, however, the parties
did not want the entire Triplets transaction to terminate upon
the occurrence of a single credit event relating to a single
reference entity, but to provide credit protection for a five-
year term.  Therefore, the Confirmation, which provides for an
"Effective Date" of May 2, 2000, defines the "Termination Date"
as "[t]he later to occur of the Scheduled Termination Date and
the final Physical Settlement date."  The "Scheduled Termination
Date" is listed as May 2, 2005.


The Solutia Credit Event and Physical Settlement

Solutia filed a bankruptcy petition in the United States
Bankruptcy Court for the Southern District of New York on
December 17, 2003.  Under the Confirmation, this filing

constituted a credit event.[6]  As a result, DB delivered to ACP a

Credit Event Notice and Notice of Publicly Available Information

dated December 17, 2003, informing ACP of the Solutia bankruptcy.

On January 16, 2004 -- the final date on which a NIPS could be

delivered -- DB sent ACP a NIPS, which stated in part:

> [DB] reasonably expects to deliver to [ACP] the
> following Deliverable Obligation: [Solutia Bonds].
> Pursuant to the terms of the Credit Derivative
> Transaction, [DB] will deliver such Deliverable
> Obligations for Physical Settlement, with the total
> outstanding principal balance required under the terms
> of the Credit Derivatives Transaction as determined by
> the Final Price of the [Solutia Bonds], on February 4,
> 2004 (the "Delivery Date").  On the Delivery Date,
> [ACP] will delivery to [DB] the amount required under
> the terms of the Credit Derivatives Transaction.

(Emphasis supplied.)  With this notice, DB chose[7] the Delivery

Date and triggered the duty of ACP to pay DB upon receipt of the

Solutia Bonds.  On February 2, DB sent ACP a letter confirming

the terms of the Physical Settlement.  The letter, which was

---

[6] The Solutia bankruptcy was not the first credit event in
the Triplets transaction.  Indeed, eight of the other 59
reference entities in the portfolio had already experienced
credit events.  In each of these settlements, DB had always
delivered a timely NIPS and tendered its obligation by the
delivery dates specified in the NIPS.

[7] The Confirmation designates DB as the Calculation Agent.
And it is the Calculation Agent who, in consultation with the
parties, determines the length of the Physical Settlement Period
based on market practice for the security to be delivered.  Bonds
such as the Solutia Bonds are subject to a three-day settlement
period.  Ordinarily, therefore, the Delivery Date would have been
three business days after January 16, or January 21.  Because DB
had to perform a final set of calculations regarding the value of
the Deliverable Obligation on January 30, however, the Delivery
Date was set three business days later, on February 4.

revised on February 3, provides in relevant part:

> For purposes of clarifying the NIPS previously
> delivered to you, we hereby notify you that on the
> Delivery Date (as such term is defined in the NIPS)
> [DB] reasonably expects to deliver to [ACP] a total of
> USD 8,771,000 in outstanding principal amount of the
> Deliverable Obligation set forth in the NIPS. ...
> Pursuant to the terms of the Credit Derivative
> Transaction, [DB] will deliver such Deliverable
> Obligations for Physical Settlement on the Delivery
> Date.  On February 4, 2004 (the Delivery Date), [ACP]
> is obligated to deliver to [DB] USD 8,771,000.

(Emphasis supplied.)

Around February 4, ACP gave instructions to its custodian bank, the Bank of New York, to receive DB's delivery of Solutia Bonds.  It also made a cash deposit of the Settlement Amount and instructed the Bank of New York to use the funds to pay for the Deliverable Obligation.

Early on February 4, ACP sent an e-mail to DB instructing it to contact Gleeson to "confirm all details."  Ballard, an employee in the London Debt Securities Operations Group at DB, subsequently left a message for Gleeson, then an accountant for the credit derivatives business line of Financial and its subsidiaries.  Later that day, Campbell, the manager of Financial's treasury operations, and Gleeson returned the call. DB recorded the conversation[8]; pursuant to regulatory

---

[8] There is some dispute about the date of the recorded conversation.  Gleeson testified that he was certain it took place on February 4, since its purpose was to confirm the details of the transfer, which the parties would need to have communicated by the Physical Settlement Date.  Gleeson referred

requirements, all calls on "financial lines" are recorded.

Consistent with Ballard's statement that DB wanted to "make sure we got the details [of the settlement] clear," the parties confirmed the value and identity of the bonds, and the Bank of New York account number.  During the conversation, which lasted just over a minute, Ballard mentioned that DB was "kind of short on ... on the position [i.e., Solutia Bonds] at the moment -- we're waiting for the bonds to come in on the other side."  After confirming account numbers and a phone number, Ballard added, "Thanks, Pete.  You should get those [the Solutia Bonds] in the next day or two."  Campbell responded, "Okay, no problem."

Under Section 9.3(c)(ii) of the 1999 Definitions, DB was required to deliver the Solutia Bonds no later than February 11 -- five business days after the Delivery Date of February 4. Therefore, even if the call took place on February 9, Ballard's suggestion that the bonds would be delivered within a "day or two" was consistent with DB's obligations under the Confirmation.

At the time, both Ballard and Campbell had operational roles

---

to the conversation in a February 4 e-mail.  DB argues that the call took place after it failed to deliver the Solutia Bonds on the Delivery Date.  Campbell testified that this sort of conversation does sometimes occur shortly after a "bond fail," and Ballard notes a communication with Campbell (although not with Gleeson) on February 9.  Given that during the call neither party mentioned that DB had failed to deliver the bonds on the Delivery Date, and that Gleeson's February 4 e-mail refers to the conversation, it seems likely that the call took place on February 4.  In any event, the parties agree that it took place no later than February 9.

14

at their respective firms.  Ballard was not authorized to enter into or substantively amend CDS transactions on behalf of DB. Likewise, Campbell, who oversaw the settlement of securities transactions, did not have the authority to enter into, substantively amend, or waive ACP's rights under contracts. There is no evidence indicating that either Ballard or Campbell believed that their brief, casual conversation altered DB or ACP's rights or obligations pursuant to the Confirmation. Ballard did not inform anyone else at DB about its substance. And after the conversation, there was no communication between DB and ACP regarding the Solutia Bonds for approximately four weeks.

DB did not make delivery on February 4 or even by February 11.  DB had earmarked Solutia Bonds it was to receive around February 4 from JP Morgan Chase ("JPMC") and Credit Suisse First Boston ("CSFB") as the bonds it would deliver to ACP.  The trades with JPMC were also CDS transactions; in that instance, DB was the protection seller.  As of February 4, DB had not yet received the bonds due under these contracts, and it therefore possessed only about one-third of the Deliverable Obligation it was to provide to ACP.  There is no evidence that DB made any effort to ensure that it received the Solutia Bonds from JPMC and CSFB in a timely manner.  As a result, the bonds slowly rolled in over the month following the delivery date.  Moreover, DB made no effort to substitute bonds owned and held by other parts of DB or to

15

enter the market and try to obtain Soutia Bonds from other sources in order to make timely delivery to ACP.  If it had entered into the market to try to obtain the bonds from other sources, it is not clear that it would have succeeded in doing so since it was difficult for CSFB to obtain Solutia Bonds during this period.

As it turned out, it took until March 4 before DB had the total amount of the Deliverable Obligation from JPMC and CSFB, and it tendered the Solutia Bonds to ACP on that same day.  The Bank of New York refused the tender because on February 26 ACP had removed its instruction to accept the delivery.  On February 26, an ACP executive with an expertise in CDS transactions and knowledge of the Triplets transaction learned for the first time that DB had failed to make a timely delivery of Solutia Bonds. She immediately understood that ACP might be "off risk" as a result of DB's default and took steps that led to the removal of the instructions to Bank of New York to pay DB.  As described below, after confirming market practice, ACP made a final decision in April not to pay.

In July 2004, DB made a demand upon AAC, pursuant to the Guarantee, to pay the amount DB believed it was owed by ACP for the Solutia Credit Event.  AAC refused to make such a payment.

<u>The Parties' Expectations Regarding the Settlement Date</u>

The parties' conversations and correspondence from the Delivery Date and the months that immediately followed it demonstrate that neither DB nor ACP believed that the Confirmation had established an open-ended delivery window.  For example, on February 4, Jennifer Jillson, a member of DB's Bond and Equity Support group, sent e-mails to others within the company regarding DB's contracts for Solutia Bonds, including the Physical Settlement and the transaction with JPMC.  She noted that the JPMC transaction was "settling today," that it was associated with a credit event, and as a result it was "important that the settlement [with JPMC] occurs."  Also on February 4, ACP's Gleeson sent an e-mail in which he detailed the logistics of obtaining the $8,771,000 to pay DB, and noted that ACP would be "required to settle [the Solutia] credit event <u>today</u>." (Emphasis supplied.)

In the three months that followed ACP's March 4 refusal to accept the Deliverable Obligation, representatives of DB and ACP engaged in multiple conversations regarding possible compromise arrangements that would not result in such a substantial loss for DB.  In these conversations, DB urged ACP to accept the bonds on the basis of the longstanding relationship between the companies, and it threatened to cut off all business with Ambac if ACP stood by its decision.  In none of these exchanges, however, did DB

17

contend that ACP had been <u>contractually obligated</u> to accept the
Solutia Bonds on March 4.[9]

There is also no evidence that DB ever believed that
Ballard's early February telephone conversation with ACP had
given DB more leeway as to the Delivery Date.  For 12 weeks after
ACP's refusal, DB made <u>no mention</u> of the conference call, which
it now alleges provided it with an indefinite extension of the
Delivery Date.  Indeed, shortly after ACP refused delivery of the
bonds, Horn, a director of Deutsche Bank Securities, a subsidiary
of DB, put together a timeline of salient events related to the
Solutia credit event.  Although the chronology includes nearly a
dozen occurrences, the early February call is not among them.  It
appears, therefore, that at the time of the Physical Settlement,
both DB and ACP understood the Confirmation to require delivery
no later than February 11, or five business days after the
Delivery Date of February 4.


<u>Industry Practice</u>

DB argues that even if the terms of the Confirmation appear
to establish a firm delivery date, the common practice of those

---

[9] DB's internal communications from this period also reflect
a belief that ACP had not violated the contract when it refused
delivery.  For example, on March 11, Nicola Harrison
("Harrison"), a DB managing director and the global head of the
Alternative Risk Markets Group, e-mailed a colleague to explain
the dispute with ACP.  Harrison noted that because DB did not
provide Ambac with any loans, "we have no leverage here at all."

in the CDS industry at the time of the Triplets transaction was
to be flexible with respect to the delivery of bonds and other
obligations.  The evidence, however, compels precisely the
opposite conclusion.

West, one of defendants' two expert witnesses testified
that, in his experience working on hundreds of CDS transactions
subject to the 1999 Definitions, no party ever discussed -- much
less agreed to -- the possibility of allowing delivery of an
obligation at any time during a multi-year portfolio transaction.
Similarly, Swain, defendants' second expert, testified that he
participated in hundreds of single-name and portfolio CDS
transactions for Assured, and that he was unaware of even a
single time that a protection buyer insisted that it could
deliver a security after the delivery date.  To the extent that a
practice of leaving trades open until the bonds were delivered
existed at all, Swain stated that it did not apply to
transactions involving non-dealer protection sellers like ACP.
Indeed, on two or three occasions, protection buyers asked
Assured to accept late delivery of their obligations, and Assured
consistently refused.

There is a compelling economic reason for parties to expect
that delivery deadlines in a CDS transaction will be inflexible.
In such transactions, the protection seller agrees to take on a
precisely defined level of risk, for which it is paid an amount

19

determined by its underwriting calculations.  An open-ended delivery deadline would make such fine-tuned calculations difficult.  As a result, a protection seller is highly unlikely to provide this sort of coverage without an express discussion of its parameters and the associated additional premium.

The evidence submitted by DB to rebut the testimony of defendants' experts is flimsy at best.  DB relies primarily on its own employees' self-serving assertions that CDS market practice allows for sufficient time after a scheduled delivery date for the deliverable obligations to be obtained and transferred.  These employees, however, identify only a handful of specific CDS transactions in which a deliverable obligation was accepted after it was due -- and in none of these instances was a non-dealer like ACP a party.[10]  DB's testimony from an expert who is not a DB employee is equally unavailing.  Sloan, previously the chief administrative officer of M. Safra & Company, a hedge fund manager, testified that "[m]arket practice in late 2003 and 2004 in the bond market regarding bond trades and bond settlements was that the party receiving the bonds did

_____

[10] Swain testified that this fact is of some significance. Dealers, such as banks and brokerage firms, usually engage in a high volume of CDS transactions, and may act as a buyer and seller of protection with respect to the same security.  Non-dealers, however, typically engage in a much lower volume of transactions and do not act both as protection buyer and protection seller with respect to the same security.  Therefore, industry practices for transactions between two dealers would not necessarily mirror those for transactions involving a non-dealer.

not cancel the trade if delivery was not made on the scheduled settlement date." Although Sloan stated that "operations departments did not differentiate between the settlement of bond transactions related to derivatives and settlement of straightforward bond transactions," she was offered as an expert on the bond market, not on CDS transactions. Indeed, she admitted that she was not qualified to answer questions about such transactions. Therefore, her testimony is of minimal relevance here.

Moreover, there is a reason why market practices in the CDS and bond markets are not, in fact, identical. In typical corporate bond transactions, the buyer of the bond has chosen to make the purchase and begins to earn interest on the delivery date, regardless of when physical delivery actually occurs. In a CDS transaction, however, the protection seller does not want the bonds; it accepts them only because it must do so pursuant to the relevant confirmation. In such transactions, delivery is triggered by a credit event, which in most cases means that interest may have ceased to accrue.

Imposing a definite and tight timeframe for delivery has particular benefits for the seller of protection that do not pertain to the regular bond market. If the bond is one of those that is covered by many CDS transactions, as it appears may have been the case with the Solutia Bonds, then more bonds may be

sought than are available in the market.  When that happens, the
buyer may be unable to obtain the bonds by the delivery date,
relieving the seller entirely of its obligation to pay, or if the
bonds are timely delivered, the intense bidding for those bonds
may create a relatively inflated market price, allowing the
credit seller to recover some of its loss by reselling the bonds
quickly before the market price collapses.

And, most significantly, unlike ordinary bond transactions,
CDS transactions are governed by detailed contracts that
incorporate a fixed timetable for delivery.  The evidence
therefore clearly establishes that at the time of the Triplets
transaction, it was the practice of the CDS marketplace to
require compliance with physical settlement deadlines.


CONCLUSIONS OF LAW

DB brings claims for breach of contract and breach of the
implied covenant of good faith and fair dealing against both
defendants.  It also brings a claim for equitable estoppel
against ACP.


I.  Breach of Contract

A.  General Standard

Under New York law, to make out a claim for breach of

22

contract, a plaintiff must establish "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co., 375 F.3d 168, 177 (2d Cir. 2004). Of course, if the conditions precedent to a defendant's duty to perform have not been met, breach is not possible. See, e.g., Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 597 (2d Cir. 2005) ("A condition precedent is an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.").

Here, DB alleges that ACP failed to fulfill its contractual obligation under the Confirmation and 1999 Definitions to make payment in exchange for DB's delivery of the Solutia Bonds. ACP argues, in effect, that because DB did not deliver the deliverable obligation by February 4, or within the five-business-day grace period, it did not satisfy a condition precedent to ACP's duty to pay, and therefore a breach of contract claim cannot lie. The central question, then, is whether the Confirmation (read in conjunction with the Master Agreement and the 1999 Definitions) required DB to make delivery by the Delivery Date in order for ACP to be obligated to make payment, or whether it allowed for a longer delivery window, either by its explicit terms, or because of the customs and

23

practices of the credit derivative marketplace.

Under New York law, the ultimate goal of contract interpretation is to construe agreements "in accord with the parties' intent." Eternity Global, 375 F.3d at 177 (citation omitted). When interpreting a contract,

> words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions. An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible.

LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005) (citation omitted). When a transaction involves multiple writings that "are designed to effectuate the same purpose, [they] must be read together, even though they were executed on different dates and were not all between the same parties." TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 89 (2d Cir. 2005) (citation omitted). If there are ambiguities in an agreement that cannot be resolved by reference to other cannons of contract interpretation, these "[a]mbiguities are generally interpreted against the drafter." RLS Associates, LLC v. United Bank of Kuwait PLC, 380 F.3d 704, 712 (2d Cir. 2004).

B. Terms of the Confirmation

DB contends that, by the terms of the Confirmation, it had

until May 2, 2005 to deliver the Solutia Bonds -- that is, more than one year later than the date on which it actually tendered the securities.  The basis for this claim is the Confirmation's definition of "Termination Date" as "the later to occur of the Scheduled Termination Date and final Physical Settlement Date." According to DB, the earliest possible Termination Date under the Confirmation, then, is May 2, 2005, which is identified as the Scheduled Termination Date.  DB further argues that this definition of Termination Date contradicts Section 9.3(c)(ii) of the 1999 Definitions, which states that if a buyer fails to deliver an obligation, the last day of the five-business-day window becomes the Termination Date.  According to DB, since terms in the Confirmation trump those in the 1999 Definitions, this effectively eliminates the requirement that the Deliverable Obligation be delivered within five days of the Physical Settlement Date.

To be sure, the Confirmation is drafted imperfectly and creates ambiguity regarding the interplay of the Termination Date and Physical Settlement Date, but under DB's interpretation of the documents, this ambiguity would all but swallow the agreement, creating many more problems than it resolves.  The ambiguity stems from the fact that in the 1999 Definitions, Termination Date has two distinct meanings: It refers to the date on which protection for the single reference entity ends, and the

25

date on which the entire transaction terminates.  Because the
1999 Definitions address a single-obligation transaction, these
two dates are the same, and a timely physical settlement (or
failure to make timely delivery of a NIPS or an obligation)
always ends not only the protection for a single reference
entity, but also the entire transaction.  Therefore, the 1999
Definitions do not differentiate between these two meanings of
Termination Date.  In a portfolio transaction, however, the buyer
has purchased protection for multiple securities.  So while both
ACP and DB intended that a single physical settlement (or failure
to deliver either a NIPS or bonds within the time allowed) would
terminate protection for that obligation, they did not intend it
to end the Triplets transaction altogether.  The confusion here
arises from the parties' failure to differentiate these two
meanings of Termination Date and provide them with separate
names.

     Nonetheless, it is not difficult to discern the parties'
intent by reading the Confirmation and the 1999 Definitions
together, and by analyzing the context in which critical terms
are used.  Beginning with the Confirmation, it is clear that DB
and ACP intended the Termination Date to define the end point of
the entire transaction.  It is for this reason that it is among
the first three defined terms in the Confirmation, coming
immediately after "Effective Date," the date on which the

transaction begins.  Thus, Triplets, with an Effective Date of
May 2, 2000 and a Scheduled Termination Date of May 2, 2005, was
designed to be a five-year transaction.

There is ample evidence that the parties anticipated that
there could be many distinct physical settlements of individual
securities on separate physical settlement dates within this
five-year term.  In the section regarding conditions to payment,
for example, the Confirmation provides: "For the avoidance of
doubt, Conditions to Payment may be satisfied more than once with
respect to this Transaction; provided, however, that the
Conditions to Payment may be satisfied only once with respect to
each Reference Entity."  Similarly, the Confirmation's definition
of the Termination Date refers to the "_final_ Physical Settlement
Date," in recognition of the fact that there could be multiple
physical settlement dates during the contract period.  (Emphasis
supplied.)  In other words, it is clear from the Confirmation
that the parties aimed to create what were, in effect, 60
_separate_ five-year CDS transactions documented with a single
agreement.  This allowed DB to retain coverage for the remaining
reference obligations even after others had been physically
settled.

DB attempts to create doubt about the parties' intent by
pointing out that the Termination Date arises in the context of
Section 9.3(c)(ii) of the 1999 Definitions, specifically the

second sentence in which the consequences of a failure to make a timely delivery are spelled out.  The first sentence of the Section establishes that the buyer can continue to make delivery attempts of the deliverable obligation for five business days after the Physical Settlement Date.  The second sentence states that if the buyer fails to make delivery during this time, the fifth day after the Physical Settlement Date "shall be deemed to be the Termination Date."  As DB correctly points out, this last phrase contradicts the definition of Termination Date laid out in the Confirmation, since on its face it would require the entire Triplets transaction to end if DB failed to deliver a single deliverable obligation within the five-day window.

DB's solution to this apparent contradiction, however, is based on an untenable reading of the Confirmation and the 1999 Definitions.  DB argues that because, under Section 9.3(c)(ii), a failure to deliver causes the last day of the delivery window to become the Termination Date, "the Termination Date is therefore the last day that the bonds can be delivered under the Confirmation."  And since the Confirmation states that the Termination Date can come no earlier than May 2, 2005, DB could not have been required to deliver the Solutia Bonds before that date.  This argument is logically flawed.  Just because the failure to deliver on the last permissible day can, in a single-obligation transaction, result in that day being deemed the

Termination Date, it does not follow that the Termination Date is the last day on which an obligation can be delivered. Indeed, DB has pointed to no language in either the 1999 Definitions or the Confirmation indicating that Termination Date should have this meaning, and thereby extend the delivery period. While the second sentence of this section identifies the consequence of a delivery failure, the first sentence defines the duty, that is the period in which delivery must be made. A change in the consequences does not change the duty.

Pointedly, the Confirmation makes no change to Section 8.1 of the 1999 Definitions (which makes payment due upon delivery "on or prior to the Physical Settlement Date"), Section 8.5 (which defines the Physical Settlement Period), or the first sentence of Section 9.3(c)(ii) (which extends the Physical Settlement Date by five days). If DB had intended to expand the timetable for delivery, it would have modified terms affecting at least these sections of the 1999 Definitions. Simply put, the Confirmation does not reflect an intention to leave the delivery window open.

The better reading of the Confirmation's definition of Termination Date takes into account the fact that the parties intended to establish separate coverage for each of the 60 securities. As noted above, DB and ACP agree that physical settlement of one security was not intended to result in

termination of the entire Triplets transaction.  Indeed, DB had already been paid by ACP on eight separate Reference Entities that had been subject to credit events without triggering the termination of the Triplets contract.  It is reasonable, then, to infer that a failure to make timely delivery of a single deliverable obligation was not meant to affect the coverage of the other securities.  The issue therefore becomes what consequences flow from a failure to deliver securities within the five-day window established by Section 9.3(c)(ii).

DB takes the wholly implausible position that there are no consequences.  It argues that under Section 9.3(c)(ii), untimely delivery would result in termination of the transaction; and because the Confirmation establishes that Triplets cannot end until May 2, 2005 at the earliest, that portion of Section 9.3(c)(ii) is overridden.  According to DB's reading of the documents, then, the parties intended to permit either party to start the clock ticking through the delivery of a Credit Event Notice, to set a 30-day window in which to deliver a NIPS,[11] and to establish a precisely negotiated physical delivery period based on market practice -- but if DB failed to delivery either a NIPS or the bonds within the designated time, it would suffer no adverse consequences at all.

---

[11] Under Section 3.4, if a NIPS is not delivered within 30 days, the thirtieth day is deemed the Termination Date.

DB's interpretation is plainly wrong.  In a single-security transaction governed by the 1999 Definitions, any failure to adhere to the detailed credit-event timeline results in the coverage for that security being terminated.  There is no evidence that the parties to the Triplets transaction intended to take what was once a mandatory timeline and eviscerate it.  The Confirmation explicitly acknowledges both parties' rights to start the timetable for delivery of a NIPS and the securities. With DB's reading, there is essentially no timetable, and ACP loses its right to trigger the countdown for delivery.  Such a result should be avoided.  Contracts should be read as a whole, with an eye toward giving effect to every provision.  State Street Bank and Trust Co. v. Salovaara, 326 F.3d 130, 139 (2d Cir. 2003).  The best reading of the agreement, then, is that a failure to make timely delivery with respect to a single security terminates the credit protection with respect to that security, but not with respect the rest of the transaction.

This reading has several advantages.  It accords with the intent of both parties.[12]  It reflects their contemporaneous understanding of the operation of their contract.  It makes commercial sense.  And, as described below, it accords with

---

[12] In summation, plaintiff's counsel acknowledged that in drafting the Confirmation, DB had not anticipated how its change in the definition of Termination Date would impact the parties' rights when a security was not timely delivered.

industry practice.

C.  Industry Practice

When attempting to determine the parties' intent, courts look first to the contract itself.  "[I]f an agreement is complete, clear and unambiguous on its face, it must be enforced according to the plain meaning of its terms."  Eternity Global, 375 F.3d at 177 (citation omitted).  If a contract is ambiguous, however, a court may look to extrinsic evidence "to ascertain the correct and intended meaning of a term or terms."  Id. at 178 (citation omitted).  The ambiguity need not appear on the face of the contract, but may exist if a term

> could suggest more than one meaning when viewed
> objectively by a reasonably intelligent person who has
> examined the context of the entire integrated agreement
> and who is cognizant of the customs, practices, usages
> and terminology as generally understood in the
> particular trade or business.

Id. (citation omitted).

Here, as noted above, there is some ambiguity regarding the interpretation of the Termination Date.  Although the Confirmation and 1999 Definitions alone would not support DB's position that the delivery window was to remain open until it obtained the necessary securities form other counterparties, DB claims that industry practice backs up this interpretation.  In the context of a sale of goods, in order to affect contract interpretation, an industry practice must have "such regularity

of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." Aceros Prefabricados, S.A. v. TradeArbed, Inc., 282 F.3d 92, 102 (2d Cir. 2002) (citing N.Y. U.C.C. § 1-205(2)). "[I]t is not necessary for both parties to be consciously aware of the trade usage. It is enough if the trade usage is such as to justify an expectation of its observance." Id. (citation omitted). Those principles will be applied here.

Here, DB has utterly failed to show the existence of a market practice for credit default instruments that would have justified an expectation that it had an unlimited delivery window absent an express provision to that effect in the Confirmation. Its sole retained expert candidly admitted that she has no expertise whatsoever in the field of credit default obligations and did not disagree with any of the statements or analysis by ACP's expert, whose expertise within the field of credit default transactions was well established and unchallenged. At most, its own employees pointed to a handful of isolated CDS transactions in which late delivery of a physical settlement obligation was accepted. In none of these transactions was a non-dealer a party, and their relevance is therefore marginal at best. ACP, on the other hand, has shown through compelling evidence that the firm practice in the CDS marketplace was to require that delivery

occur according to the timetable to which the parties had agreed.
Under these circumstances, DB could not reasonably have expected
that ACP would accept delivery after February 11 -- and should
have expected just the opposite.

Indeed, the evidence shows that DB itself understood in
February 2004 that it had a firm obligation to deliver the
Solutia Bonds by the date it identified in the NIPS it sent to
ACP, or within the five-business-day window that followed.  In
March, April, and May, as executives in the companies discussed
ACP's refusal to accept DB's late-tendered bonds, DB never took
the position that ACP was contractually bound to accept them.  In
fact, in a candid internal communication, it conceded it had "no
leverage ... at all" in the negotiations.


D.  Waiver

DB claims that even if the Confirmation required it to
deliver the Deliverable Obligation by February 4 or 11, ACP
waived its right to insist on compliance with that provision
during the tape recorded conference call, which it asserts
occurred on February 9, but which most likely occurred on
February 4.  Waiver occurs when a party to a contract
"intentional[ly] relinquish[es] ... a known right."  Gilbert
Frank Corp. v. Fed. Ins. Co., 70 N.Y.2d 966, 968 (1988).  Once
this occurs, the waiving party can no longer insist on strict

34

performance of the relevant contractual duties.  13 Williston on

Contracts § 39:27 (4th ed. 2000).  Waiver may be made by express

declaration or may be inferred from a party's actions.  Because

the effect of waiver is to eliminate otherwise valid contractual

provisions, however, it is not "lightly presumed."  <u>Gilbert</u>

<u>Frank</u>, 70 N.Y.2d at 968.  "Intent to waive will not be inferred

from doubtful or equivocal acts or language; rather, in the

absence of an express declaration . . ., there must be a clear,

unequivocal, and decisive act of the party who is claimed to have

waived its rights that no other reasonable explanation is

possible."  13 Williston at § 39:28; <u>accord</u> <u>Lamborn v. Dittmer</u>,

873 F.2d 522, 529 (2d Cir. 1989).

Under this standard, DB's claim that ACP waived its right to

insist upon early-February delivery clearly fails.[13]  The

conversation between Campbell and Ballard involved precisely the

sort of "doubtful or equivocal acts or language" that cannot

serve as the basis for waiver.  Their discussion, which focused

---

[13] Although it is not entirely clear from its briefs, DB
appears to argue that ACP's failure to "demand immediate
performance" between February 9 and February 26 (the day ACP
instructed the Bank of New York not to accept DB's tender)
constituted a waiver, as well.  It did not.  Nothing in the
Confirmation or the 1999 Definitions obligates the protection
seller to notify the protection buyer of its expectations
regarding the timing of physical settlement.  After all, it is
the <u>protection buyer</u> who sets that schedule through delivery of
the NIPS.  Furthermore, after February 11, ACP was not
contractually obligated to accept the Solutia Bonds, so its
failure to demand delivery after that date cannot fairly be
interpreted as a waiver of any rights.

on operational details of the physical settlement, was casual;
and Campbell's statement that it would be "no problem" if ACP
received the Solutia Bonds in the next two days was an off-hand
remark that cannot reasonably be construed as an express
declaration of waiver.  But even _if_ the conversation had been
more concrete, the call still would not have constituted a waiver
of ACP's right to insist on delivery within the five-business-day
window for three additional reasons: (1) Neither Ballard nor
Campbell and Gleeson were authorized (or appeared to be
authorized) to make material alterations to the Confirmation; (2)
the Confirmation could not be modified, except in writing; and
(3) it is clear that, to the extent Campbell consented to
anything, he agreed to nothing more than that DB would be allowed
to deliver the Solutia Bonds "in the next day or two" -- that is,
within the five-day window, which was to expire two days later
(if the call occurred on the date DB has identified).


1.  Lack of Authority to Modify the Confirmation

     Under common law agency principles, an organization is
liable for contractual obligations incurred by someone who has
actual, apparent, or implied authority to consent on its behalf.
F.T.C. v. Verity Intern., Ltd., 443 F.3d 48, 64 (2d Cir. 2006)
(citing Restatement (Second) of Agency § 140 (1958)).  Here, the
participants in the February 9 call lacked actual authority to

negotiate contracts on behalf of their respective employers. DB relies on apparent authority. "For apparent authority to exist, there must be words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction on behalf of the principal." Cromer Finance Ltd. v. Berger, 137 F. Supp. 2d 452, 486 (S.D.N.Y. 2001) (citation omitted). That is, if ACP had communicated to DB, either implicitly or explicitly, that Campbell or Gleeson were empowered to alter the terms of the Confirmation, the conversation might have resulted in changes to the agreement. DB, however, has submitted no evidence to support this contention. DB's suggestion that Campbell and Gleeson created the impression that they had the necessary authority to alter the Confirmation merely by stating that they were "representatives of Ambac" is absurd. Furthermore, this was a conversation between employees involved in the operations of both companies; they were not the high-level executives that one would reasonably expect to negotiate the terms of a multi-million-dollar contract. Therefore, even if the conversation had been less casual and equivocal, it could not have yielded a binding, material change to the rights and obligations of the parties under the Confirmation.

2.  No Oral Modifications Clause

    Section 9(b) of the Master Agreement provides that "No amendment, modification or waiver in respect of this Agreement will be effective unless in writing ... and executed by each of the parties."  Pursuant to N.Y. Gen. Oblig. Law § 15-301(1), New York "enforces such requirements and does not permit oral modification when the original written agreement provides that modifications must be in writing and signed."  John Street Leasehold LLC v. FDIC, 196 F.3d 379, 382 (2d Cir. 1999).

    There are, however, two situations in which New York law enforces oral modifications notwithstanding a contractual clause requiring alterations to be in writing: "where there has been (1) partial performance or (2) reliance -- but only where the subsequent performance or reliance is unequivocally referable to the modification."  Id. (citation omitted).  DB alleges that the second exception is implicated here.  It has not, however, provided any evidence of its reliance on the conversation. Indeed, Ballard himself testified that after the conversation occurred, he recorded it in DB's internal system, but did not tell anyone else in the company about it.  And DB has not produced a single additional employee who was aware of the conversation prior to June.  DB has admitted in its trial papers that it simply followed its usual practice in waiting for the Solutia Bonds to arrive.  As a result, to the extent Campbell's

38

statement could be construed as an attempt to modify the
Confirmation, it could not be given effect because of the Master
Agreement's prohibition on oral modifications.

3.  Campbell's Statement

In any event, DB's insistence upon advancing the waiver
argument is perplexing, given the actual content of the
conversation.  DB's position rests almost entirely upon the fact
that Campbell said "Okay, no problem" in response to Ballard's
suggestion that DB would deliver the Solutia Bonds "in the next
day or two."  Even if this exchange could be construed as a
binding agreement between DB and ACP, it would not have provided
DB with the open-ended extension it now claims to have received.
A colorable argument could perhaps be made that "the next day or
two" is colloquially understood to mean "soon" and that the
statement therefore did not limit DB's delivery window to
precisely 48 hours.  Under no circumstances, however, could "the
next day or two" be fairly interpreted to cover DB's actual
delivery of the Solutia Bonds, which did not take place until
approximately four weeks later.

DB was therefore required to deliver the Solutia Bonds
within the five-business-day grace period after the delivery date
of February 4.  Because DB failed to fulfill that condition
precedent, ACP was under no contractual duty to pay, and DB's

claim that ACP breached the Confirmation fails.  Furthermore, since ACP was not obligated to pay DB under the Confirmation, AAC incurred no obligation pursuant to the Guarantee.  Therefore, the breach of contract claim against AAC fails, as well.

## II.  Implied Covenant of Good Faith and Fair Dealing

"Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance."  Dalton v. Educ. Testing Serv., 87 N.Y.2d 384, 389 (1995).  Each promisor must exercise good faith with respect to "any promises which a reasonable person in the position of the promisee would be justified in understanding were included."  Id. (citation omitted).  In addition, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Id.  The covenant "can only impose an obligation consistent with other mutually agreed upon terms in the contract.  It does not add to the contract a substantive provision not included by the parties."  Broder v. Cablevision Systems Corp. 418 F.3d 187, 198-99 (2d Cir. 2005) (citation omitted).  In other words, if a contractual term applies, a plaintiff cannot replace a failure to show a breach of contract by referring to the implied covenant.  See, e.g., State Street Bank and Trust Co. v. Inversiones Errazuriz, 374 F.3d 158, 170 (2d Cir. 2004) (holding that

"[w]here a contract allows a bank to withhold consent for particular conduct and sets no express restrictions on the bank's right to do so, the bank is not prohibited from unreasonably or arbitrarily withholding such consent").

DB attempts to circumvent this prohibition by arguing that its breach of contract claims arise out of ACP's refusal to pay for delivery of the Solutia Bonds, while its claim for breach of the implied covenant is based on two actions that the terms of the Confirmation did not explicitly cover: (1) ACP's "misleading" statement that it "would still accept the bonds after February 4," and (2) its "secret[]" withdrawal of delivery instructions from the Bank of New York on February 26. As an initial matter, DB's argument that these are not the "same facts" is tenuous at best. After all, DB contends that the telephone conversation induced it to make a late delivery, and the breach of contract claim would never have arisen at all if ACP had not instructed the Bank of New York to refuse DB's tender. Therefore, the claim of breach of the implied covenant fails as a matter of law.

Even if it were not legally faulty, DB's claim fails because ACP did not actually breach the implied covenant of good faith and fair dealing. First, it was not "misleading" for ACP to say that it would accept the Solutia Bonds after February 4, since it was contractually obligated to accept them until February 11. Second, because it was not contractually required to accept

41

delivery after February 11, ACP was under no obligation to inform DB of its decision to withdraw its authorization from the Bank of New York.[14]  Finally, ACP has submitted ample evidence that it acted cautiously in responding to DB's late delivery.  Soon after DB attempted to deliver the Deliverable Obligation on March 4, Cynthia Parker and other ACP employees began asking colleagues in the industry whether ACP was within its rights to decline to accept the bonds.  They appear to have made these inquiries in good faith and determined that ACP's actions were consistent with industry practice.  Indeed, ACP waited until April to make its final decision to refuse payment on the bonds.  Therefore, it did not breach the implied covenant of good faith and fair dealing.

III.  Equitable Estoppel

Under New York law, a party claiming equitable estoppel must show that the opposing party: (1) engaged in "conduct which amounts to a false representation or concealment of material facts"; (2) intended that this conduct would be "acted upon by the other party"; and (3) had "knowledge of the real facts."  In re Vebeliunas, 332 F.3d 85, 93-94 (2d Cir. 2003) (citation

---

[14] In any event, Solutia Bonds were difficult to obtain during this period.  Therefore, even if DB had known of ACP's intention to withdraw its authorization from the Bank of New York, it is by no means clear that it would have been able to obtain the necessary quantity of bonds from other sources more quickly than it did from CSFB and JPMC.

omitted).  With respect to itself, the party must show: "(1) lack of knowledge and of the means of knowledge of the true facts; (2) reliance upon the conduct of the party to be estopped; and (3) prejudicial changes in their positions."  Id. at 94.

DB claims that ACP should be estopped from refusing delivery of the bonds because it led DB to believe that it would accept the Deliverable Obligation after the Physical Settlement Date. The bulk of this argument has been addressed elsewhere in the Opinion.  Here, it is sufficient to observe that DB has utterly failed to carry its burden of demonstrating that ACP intended to induce DB to make a late delivery, or that DB actually relied on any of ACP's statements or actions in determining how and when to settle the transaction.  The claim for equitable estoppel therefore fails.

Conclusion

For the foregoing reasons, each of DB's claims is denied in its entirety. The Clerk of Court shall enter judgment for the defendants and close the case.

SO ORDERED:

Dated:    New York, New York
          July 6, 2006

                                    _____
                                            DENISE COTE
                                    United States District Judge