UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DEUTSCHE BANK AG,                               :     04 CV 05594
                           Plaintiff,           :     Judge Cote
               vs.                              :
AMBAC CREDIT PRODUCTS, LLC                      :
and AMBAC ASSURANCE CORPORATION,                      ECF Case
                                                :
                           Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DECLARATION OF DAVID G. GLEESON

**David G. Gleeson** declares as follows of his personal knowledge:

1. I am currently employed by Ambac Financial Group, Inc. ("Financial") as a Vice President in the consumer asset-backed securities group, a position I have held since July 2005.[1]

2. Between 2000 and 2005, I was employed by Ambac as an accountant for the Ambac's credit derivatives business line. My responsibilities included recording receivables and deliverables in the general ledger and preparing reports for both internal and external use, all for Ambac's credit derivatives business. In 2000, when I started at Ambac, I was a senior accountant. In January 2002, I was promoted to Assistant Vice President, and, in January 2004, I was promoted to Vice President. Although I served an accounting function for credit derivatives transactions between 2000 and 2005, my responsibilities shifted from that of doing the actual accounting to supervising others who performed the accounting during this period. As an ac-

---

[1] Financial owns a number of subsidiaries, including Ambac Credit Products, LLC ("ACP") and Ambac Assurance Corporation. I will refer in this Declaration to the group consisting of Financial and its subsidiaries as "Ambac."

countant for the credit derivatives business line, I was also responsible for insuring that the appropriate bank accounts contained sufficient funds to settle credit derivatives transactions. Between 2000 and January 2004, I reported to Karen Ma, the derivatives controller, and in January 2004 I began reporting to Robert Eisman, the corporate controller.

3. Between 1997 and 2000, I was an accountant at Deloitte & Touche. In this position, I had no involvement with credit derivatives.

4. In 1997, I graduated from the University of Scranton with a bachelor's degree in accounting.

### My Role in the Solutia Credit Event

5. My principal role in the Solutia Credit Event was as an accountant. I was responsible for ensuring Ambac had sufficient funds in the right account to settle the Credit Event and that the transaction was properly booked. Included in these accounting functions was a responsibility to review the amount of money that ACP was going to pay in order to ensure that it accurately reflected ACP's liability to Deutsche Bank ("DB").

6. As an accountant that booked credit derivatives transactions, I was, by no stretch of the imagination, in charge of settlements under those transactions. However, in connection with the settlement of a few credit derivatives transactions (including the settlement of the Solutia Credit Event), I did serve as a kind of internal communications facilitator, sometimes referred to as a "point person." Since everyone within Ambac who has a role in a settlement of may not have routine communications with each other, it is sometimes helpful for an individual to serve as a communications facilitator for connecting the different Ambac groups and personnel, including the business side, the operations group, the legal department, the surveillance group, individuals who handled our relationships with reinsurers, and the accounting group. In this role, I would, for example, send copies of faxes received from DB to all of the Ambac peo-

ple involved in the transaction. I also put the two parties' operations personnel (Peter Campbell for Ambac and a DB operations person) in touch with each other when the DB operations person called me in early February 2004. In this capacity, I was not generally responsible for communicating with counterparties. Even in those areas where my accounting role required me to be involved--such as monitoring the market price quotes which a protection buyer was required to obtain from bond dealers--traders on the business side would handle most of the communications with the counterparty. In those instances where counterparties would contact me, I would direct their communication to the appropriate person within Ambac.

7. Although I performed the role of "point person" on the Solutia settlement, it was always clear to me that I was not responsible for making business decisions and did not have the authority to enter into contracts on behalf of Ambac, amend contracts to which Ambac was a party, or waive Ambac's rights under contracts. I had no involvement in the business or substantive decisions that Ambac had to make in the settlement of the Solutia Credit Event. For instance, at one point, DB requested that the Solutia Credit Event be settled with a cash settlement rather than a physical settlement. I played no role in deciding whether or not ACP would agree to that request. Similarly, I played no role in the decision on February 26, 2004 to withdraw the instructions from The Bank of New York to automatically accept delivery of Solutia bonds from DB. I also had no involvement in deciding whether ACP should accept a delivery of Solutia bonds from DB on of after March 4, 2004.

### DB's Failure to Deliver

8. In February 2004, Ambac had no formal procedure for notifying others within Ambac when a securities delivery did not occur when it was expected, presumably because events like that were so rare. On February 10, Tom Gandolfo sent me an email inquiring as to the status of the settlement of the Solutia Credit Event. I replied (in Exhibit 70) that we

were ready to settle but that DB had informed us that they would not have the bonds to deliver until that day or the following day.

9. At some point in February 2004, I had a conversation with Cindy Parker that was unrelated to the Solutia Credit Event. During that conversation, I mentioned that no Solutia bonds had been delivered yet. Ms. Parker was surprised to learn that no bonds had been delivered and remarked that ACP might be off risk because of DB's untimeliness in delivery. She said she would look into it.

10. On February 26, I received an email from Cindy Parker (Exhibit 80) informing me that Ambac should not accept delivery of the Solutia bonds at that time.

### Reinsurance

11. In my deposition in this case, I testified that I believed that Ambac held a reinsurance policy with Ram Reinsurance Company which required the reinsurer to reimburse Ambac for its payment for bonds resulting from the Solutia Credit Event. In stating this, I meant that, under the Ram Reinsurance policy, the Ram Reinsurance Company would reimburse ACP for its payment for bonds resulting from the Solutia Credit Event. I did not mean to suggest that Ambac as a whole was insured as to any losses that it would incur during Credit Events in the Triplets transaction.

### Market Practice

12. Between 2000 and 2005, I was involved in approximately five or six settlements in credit derivatives transactions. Other than the Solutia settlement, I believe all of the physical deliveries occurred on the physical settlement date.

13. I have no knowledge of a practice in the credit derivatives industry whereby a party that is delivering bonds or other obligations is entitled to an indefinite extension of time in which to deliver them in a credit derivative transaction beyond the agreed settlement

4

date or deadline. I have been shown a copy of the letter dated January 24, 2006 from Lisa A. Sloan to Theodore D. Aden regarding a standard market practice in the bond market. Although I do not disagree with Ms. Sloan's statement regarding the general bond market, I have never heard of any such standard practice in the credit derivatives market

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 26th day of May, 2006 at New York, New York.

_____
David G. Gleeson