UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| DEUTSCHE BANK AG, | 04 CV 05594 |
| Plaintiff, | Judge Cote |
| vs. | |
| AMBAC CREDIT PRODUCTS, LLC and AMBAC ASSURANCE CORPORATION, | ECF Case |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DECLARATION OF JOSEPH W. SWAIN

**Joseph W. Swain** declares as follows of his personal knowledge:

1. I am the Chief Financial Officer and treasurer of R.V.I. Group Insurance Company. From 1988 to 2004, I was a senior officer (including President from 1995 to 2004 and CEO from 2002 to 2004 ) of Assured Guaranty Corporation ("Assured").

2. I am a Certified Public Accountant and a member of the American and Pennsylvania Institutes of Certified Public Accountants and have been a member of the Association of Financial Guarantors (of which I was Vice Chairman from 2002 to 2004).

### Basis for My Opinion

3. My opinion is based primarily upon my experience during my tenure with Assured, a monoline insurance and financial guaranty company, from 1988 to 2004. During the period from 1996 (essentially, the advent of credit default swap transactions) to 2004, Assured entered into, as protection seller, over 400 "single name" credit default swap ("CDS") transactions and hundreds of portfolio transactions with many different counterparties. During that period Assured had up to $11 billion notional amount of single-name CDS contracts and up to $20

billion of portfolio CDS contracts outstanding at any one time. Over that entire period I participated in, and supervised, the underwriting, negotiation and execution of every CDS transaction that Assured entered into.

### Market Practices Relating to Physical Settlement of CDS Transactions

4.  I have been provided with a copy of a letter dated January 24, 2006 from Lisa A. Sloan to Theodore D. Aden expressing the following opinion:

> Market practice in late 2003 and 2004 in the bond market regarding a bond trade was that the party receiving the bonds did not cancel the trade if delivery was not made on the scheduled settlement date. Standard market practice was that the trade remained open until the delivery of the bonds was made, or the parties reached an agreement otherwise settling or terminating the trade.

5.  Whether or not Ms. Sloan's opinion is correct with regard to the market(s) in which corporate bonds are bought and sold (or some segment of those market(s)), the market practice she mentions simply did not apply, in the period from 2000 to 2004, to the delivery of corporate bonds to non-dealer protection sellers (such as monoline insurance companies) in connection with the physical settlement of CDS transactions, in which market practices are quite different. Rather, in my experience and opinion, in CDS transactions (whether single-name transactions or portfolio transactions covering multiple reference entities) non-dealer protection sellers[1] and their protection buyers strictly observed and relied upon the timeline for delivery (in the case of physically settled transactions) determined in accordance their contractual documentation and the protection sellers were not expected, according to such market practice, to allow delivery of

---

[1] I distinguish transactions that are between two dealers because dealers generally have a high volume of transactions in both directions between themselves and, as a result, may have different customs and practices. In addition, dealers are often conduits and thus have different interests and incentives than non-dealer protection sellers with regard to settlements.

2

bonds with respect to which a Credit Event has occurred to be made during some indefinite time later than that timeline.

### My Experience with CDS Delivery Windows

6.  In my experience, CDS terms related to settlement are highly negotiated. In the context of cash settlements, the buyer of credit protection would have to solicit market price quotations (also known as bids) from a specific number of dealers over a specific period of time in order to determine the value of the security and, thus, the amount of the protection buyer's loss. The time frame during which the bids would be obtained, the dealers that were eligible to provide bids, and how the bids were used to determine a cash settlement price were all highly negotiated. In the context of physical settlement, which bonds and loans would be Deliverable Obligations and the timing of the delivery were highly negotiated.

7.  During the entirety of my experience with Assured, I cannot recall a single instance in which a protection buyer delivered a bond after the specified physical settlement date nor a single time that a protection buyer ever contended that it had the right, based on market practice, to deliver a bond later than the delivery timeline determined in accordance with Assured's contract with that buyer.

8.  On a small number of occasions (almost certainly between one and three), prior to the physical settlement date, a protection buyer asked Assured whether Assured would be willing to accept a late delivery because the protection buyer was having difficulty obtaining the bonds.[2] The protection buyer would make this request to the head of Assured's surveillance unit. On each of those occasions, Assured refused to accept a late delivery.

---

[2] In my deposition, I testified that, in CDS transactions in which Credit Events are physically settled, the protection buyer must deliver the bond or other Deliverable Obligation by the physical settlement date. Since my deposition, I have been reminded that the International Swaps and Derivatives Association's 1999 Credit Derivative Definitions ("99 Definitions") provides for a five business day period after the

3

### Differences between Bond and CDS Transactions

9.  The market practice mentioned in Ms. Sloan's report does not apply in the credit derivatives market because the bond market is fundamentally different from the credit derivatives market.

10. Ordinary bond purchase and sale transactions take place between a seller desiring to make delivery and a buyer desiring to take delivery of the bond in question, and it is fully anticipated that delivery will occur. Bond transactions take place in high volume--many thousands each business day--for which a degree of fluidity and liquidity is necessary for the functioning of that market. In addition, in the case at least of investment-grade bonds, the buyer begins to earn the interest that is accruing on the bond from the trade date, even if delivery is delayed, and thereby enjoys a benefit as a result of the seller's failure to deliver on a timely basis. As such, buyers of investment-grade bonds with respect to which events such as Credit Events have not occurred are, in fact, willing to accept late delivery.

11. CDS transactions are very different from ordinary bond purchase and sale transactions for a number of reasons, which give rise to different expectations and practices. First, a non-dealer protection seller to which a bond is delivered does not take delivery because it wants the bond; rather, it takes delivery (and pays the face amount, thereby incurring a loss of the difference between face amount and market value) only because and when it is contractually obligated to do so. Second, the expectation in a CDS transaction is that there will be no, or very few, physical deliveries, unlike the expectation in ordinary bond transactions that a physical delivery will consummate all or most of them. Third, by the time a bond is being delivered in a CDS transaction, a Credit Event (such as bankruptcy) must have occurred, so what may have

---

physical settlement date to deliver the bonds. Virtually all, if not all, of the CDS transactions that Assured enter into while I was employed there settled within the five business day period provided in the '99 Definitions.

4

been an investment-grade credit has deteriorated to a distressed level, and interest may have ceased to accrue on the bond, or at least is in grave danger of non-payment.

### **Delivery Window Is a Significant Financial Term**

12.     The idea of an indefinitely "open" period for the delivery of bonds, as described by Ms. Sloan, that was not expressly bargained and paid for is completely inconsistent with the nature of a CDS transaction. In a CDS transaction, a non-dealer protection seller, such as a monoline insurance company, is agreeing to assume a very precisely defined level of risk and is compensated for doing so. Every term of a CDS transaction (obviously economic terms and seemingly procedural terms alike) affects, or has the potential to affect, the exact risk profile that the protection seller is assuming. The precise quantity, duration and other characteristics of the risk being assumed are negotiated in exacting detail by protection buyers and sellers, and the seller, calculating and analyzing the risk it is being asked to assume, bargains for the compensation it will accept for assuming that risk (or declines to assume it and walks away from the bargaining table). Whether a protection seller will be obligated to accept and pay for distressed bonds only within a time period that is determined in accordance with the contract, or whether it will be so obligated during some longer, or even some indefinite, period, may materially change the risk profile that is being assumed (or declined) and paid for. In short, optionality has value, and if a protection buyer desires a longer (or even an indefinite) period of time in which to deliver a bond in a physical settlement, it must expressly bargain for that optionality and the protection seller must have the opportunity to assess whether it is willing to assume the potentially increased risk and, if so, at what price. Optionality is not free and, if it was not bargained for, may not be just taken by protection buyers.

13.     Further, because of the nature of distressed debt markets, this option of delivering the bond over the course of a long delivery window is likely to have a high value. Dis-

tressed debt markets tend to be illiquid. The relatively small number of trades in distressed debt markets means that prices fluctuate substantially, spreads between bid and ask prices are very wide, and information arbitrage is easier. Because of all of these aspects of distressed debt markets, requiring a protection buyer to deliver the bond within a very narrow delivery window will sometimes force the buyer to deliver the bond when there are few available bonds on the market and, hence, when its price is highest. This situation is referred to as a "squeeze." When negotiating and evaluating the risks involved in a CDS transaction, Assured explicitly relied upon the possibility of a squeeze as one of the factors that would reduce the amount of its risk and increase the potential profitability of the transaction. In short, the length of a delivery window in which the protection buyer has to deliver the obligation is a significant financial term of a CDS.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on the 31st day of May, 2006 at Stamford, Connecticut.

Joseph W. Swain