Theodore D. Aden (TA-6689)
Epstein Becker & Green, P.C.
250 Park Avenue
New York, New York 10177
(212) 351-4500
Attorneys for Plaintiff Deutsche Bank AG

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
DEUTSCHE BANK AG,

                Plaintiff,          04-CV-5594

      – against –                Judge Denise Cote
                                     Magistrate Judge Kevin N. Fox
AMBAC CREDIT PRODUCTS, LLC
and AMBAC ASSURANCE CORPORATION,

                Defendants.
------------------------------------X

## DECLARATION OF BOAZ WEINSTEIN

**BOAZ WEINSTEIN** declares as follows:

1.    I am currently employed by Deutsche Bank AG, New York Branch, a branch of plaintiff Deutsche Bank AG ("Deutsche Bank"), as Head of Credit Trading for the Americas. I have been responsible for all corporate credit derivative transactions entered by Deutsche Bank in the United States since 2000, including the Triplets transaction between Deutsche Bank and Ambac Credit Products, LLC ("Ambac Credit") which is at issue in this litigation.

2.    I received a Bachelor of Arts degree from the University of Michigan in 1995.

3.  I was originally hired by Deutsche Bank in January 1998 as a Credit Derivatives Trader. Since being hired by Deutsche Bank, I have also held the titles of Head of Investment Grade Credit Derivatives Trading and Head of Credit Derivatives Trading.

4.  As a result of my employment experience, I am very familiar with the credit derivatives market, including the trading, negotiation and settlement of credit derivative transactions. I have been involved in hundreds of credit derivative transactions, including dozens of "portfolio" credit derivative transactions. In 2005, I also taught a course on credit derivatives at the School of Continuing and Professional Studies at New York University.

5.  The credit derivatives market substantially began in 1998. Since that time, Deutsche Bank has been one of the largest participants in the credit derivatives market.

6.  Deutsche Bank and Ambac Credit entered into a Master Agreement dated as of December 17, 1998, and a Schedule and Credit Support Annex thereto, on International Swaps and Derivative Association, Inc. ("ISDA") forms to govern certain credit derivative transactions between them (collectively, "the Master Agreement").

7.  Deutsche Bank and Ambac Credit entered into a Confirmation dated April 19, 2000, issued under the Master Agreement (the "Confirmation") relating to a specific credit derivatives transaction known as "Triplets" (the "Triplets Transaction"). The Confirmation sets forth the specific terms of the Triplets Transaction.

8.  The Confirmation incorporated by reference the Master Agreement and the 1999 ISDA Credit Derivatives Definitions (the "1999 Definitions") and, collectively,

together with certain unrelated amendments to the Master Agreement, those documents comprise the contract between Deutsche Bank and Ambac Credit.

9. In the Triplets Transaction, Deutsche Bank purchased credit protection from Ambac Credit, the credit seller, with respect to a portfolio of sixty different companies or Reference Entities and their corresponding Reference Obligations, which were listed in the Confirmation. The Triplets Transaction is a "portfolio" credit derivative transaction.

10. Portfolio credit derivative transactions, such as the Triplets Transaction, became a part of the credit derivatives market in 2000.

11. The Triplets Transaction was one of the first portfolio credit derivative transactions entered by Deutsche Bank. It also was one of the first portfolio credit derivative transactions in the market generally.

12. I was involved in the Triplets Transaction when it was entered in April 2000.

13. It was the intent of Deutsche Bank and it is the intent stated in the Confirmation that there would be one Termination Date, which was May 5, 2005. Physical delivery of bonds or Reference Obligations pursuant to the Confirmation could be made until May 5, 2005, or later if the parties so agreed. If Ambac had wanted separate Termination Dates for each Reference Entity listed in the Confirmation, they could have raised that issue in negotiations. They did not.

Case 1:04-cv-05594-DLC   Document 73   Filed 07/10/06   Page 4 of 12

14. Deutsche Bank paid Ambac Credit at regular intervals for the credit protection it received under the Confirmation and such payments totaled approximately $4.6 million.

15. Throughout the course of the Triplets Transaction, Deutsche Bank has tried to accommodate Ambac Credit's concerns and requests, even if Deutsche Bank disagreed with them.

16. Ambac Credit, for example, sought to physically settle a prior Credit Event under the Confirmation with respect to Teleglobe Inc. ("Teleglobe"), another Reference Entity listed in the Confirmation. Although the Confirmation called for cash settlement rather than physical settlement, Deutsche Bank consented to Ambac Credit's request to physically settle the Teleglobe Credit Event.

17. In 2002, Solutia Inc. ("Solutia"), the Reference Entity listed in the Confirmation which is at issue in this litigation, underwent a restructuring which Deutsche Bank believed constituted a Credit Event under the Confirmation. On November 1, 2002, Deutsche Bank served Ambac Credit with a Credit Event Notice relating to that restructuring of Solutia.

18. Ambac Credit asserted that the 2002 restructuring of Solutia was not a Credit Event under the Confirmation, and asked Deutsche Bank to withdraw its Credit Event Notice. In response to Ambac Credit's request, Deutsche Bank withdrew the Credit Event Notice on December 16, 2002.

NE:221856v1                                     4

19. On December 17, 2003, a Credit Event under the terms of the Confirmation occurred with respect to Solutia when it filed a bankruptcy petition in the U.S. Bankruptcy Court for the Southern District of New York (the "Solutia Credit Event").

20. On December 17, 2003, Deutsche Bank sent to Ambac Credit and Ambac Assurance Assurance Corporation ("Ambac Assurance") a Credit Event Notice and Notice of Publicly Available Information dated December 17, 2003 regarding the Solutia Credit Event.

21. Deutsche Bank requested that Ambac Credit cash settle the Solutia Credit Event. Ambac Credit refused to cash settle it and instead insisted on a physical settlement.

22. Deutsche Bank issued a Notice of Intended Physical Settlement ("NIPS"), dated January 16, 2004, relating to the Solutia Credit Event, stating that Deutsche Bank reasonably expected to deliver to Ambac Credit 7.375% bonds issued by Solutia due October 15, 2027 (Cusip number US834376AB1) (the "Solutia Bonds").

23. Ambac Credit and Deutsche Bank agreed on or about February 3, 2004 that Ambac Credit would pay Deutsche Bank $8,771,000 for the Solutia Bonds.

24. Ambac Credit did not object to the NIPS.

25. The Scheduled Physical Settlement Date was February 4, 2004 pursuant to the NIPS.

26. Deutsche Bank was not able to deliver the Solutia Bonds in a principal amount of $8,771,000 to Ambac Credit on or before February 4, 2004 because it was waiting to receive Solutia Bonds from two of its counterparties, Credit Suisse First Boston ("CSFB") and

JP Morgan Chase Bank ("JPM"), in other transactions or trades scheduled to settle on or before February 4, 2004 and those counterparties failed to deliver the Solutia Bonds to Deutsche Bank on or before February 4, 2004. The trade with JPM was in connection with a credit derivative transaction. The trade with CSFB was not a credit derivative transaction.

27. Deutsche Bank tendered delivery of the $8,771,000 principal amount of the Solutia Bonds to Ambac Credit on March 4, 2004, which was timely under the Confirmation.

28. Deutsche Bank's delivery of the Solutia Bonds to Ambac Credit on March 4, 2004 also was proper under applicable market practice.

29. Credit derivative transactions start out as synthetic transactions. They essentially become bond transactions through the physical settlement process. The parties agree to the amount of bonds to be delivered, the price to be paid for the bonds and the settlement or delivery date. The market practices for a bond delivery pursuant to a credit derivative transaction and a regular bond trade are the same within that framework.

30. Flexibility of delivery in the bond market reflects the fact that bonds are not always available for delivery. In 2004, there were many billions of dollars in credit derivative transactions. Even a small percentage of those credit derivative transactions involves an enormous amount of bonds. These delivery issues are present in a bond delivery whether it is a bond delivery pursuant to a credit derivative transaction or otherwise.

31. The market practice regarding bond deliveries pursuant to credit derivative transactions is to allow for sufficient time for the bonds to be delivered even after a scheduled delivery or settlement date.

32. The extension of time permitted by this market practice is of indefinite nature. If the seller feels that the extension of time is dragging on too long, it is the seller's obligation to request that delivery be expedited.

33. This market practice I have described applies to all transactions involving bond delivery in the fixed income market, be it credit derivative transactions or other bond trades.

34. This market practice is derived from a well established practice in the bond market.

35. This market practice applies not only to transactions between two dealers, but also to transactions between dealers and non-dealers. This market practice applies to all market participants, including "end users."

36. As per this market practice described above, if a bond is not delivered on the scheduled settlement or delivery date, the party scheduled to receive the bonds waits for the bonds to come in. That party may also contact its counter-party to confirm the trade.

37. Based on this market practice, Deutsche Bank waited for its counter-parties to deliver the Solutia Bonds so that Deutsche Bank could in turn deliver them to Ambac Credit. Deutsche Bank communicated with its counter-parties to confirm the trades and that the Solutia Bonds would be delivered by them to Deutsche Bank when available.

38. According to this market practice, if a counter-party has an issue with a late delivery of a bond, then that party should make the other counter-party aware of such issue.

39. Ambac Credit did not notify Deutsche Bank of any issue with the delivery of the Solutia Bonds. Ambac Credit did communicate with Deutsche Bank to confirm the trade, which is consistent with market practice.

40. Had Ambac Credit called Deutsche Bank and said that there was an issue with Deutsche Bank delivering the Solutia Bonds later than originally scheduled, Deutsche Bank then would have had to determine if it could fulfill that request or work with Ambac Credit to select a new delivery date.

41. Ambac Credit, however, never told Deutsche Bank it had any concerns about the delivery of the Solutia Bonds and never demanded that the Solutia Bonds be delivered by a certain date.

42. Had Ambac Credit told Deutsche Bank that it needed the Solutia Bonds to be delivered by a certain date, Deutsche Bank would have made efforts to acquire the Solutia Bonds sooner.

43. Here, Ambac Credit was not disadvantaged by delivery of the Solutia Bonds thirty days after the scheduled physical settlement date. First, Ambac Credit would have paid $8,771,000 on February 4, 2004 and would have paid the same amount of money for delivery on March 4, 2004. Throughout that thirty-day period Ambac Credit retained possession and use of that $8,771,000. Second, Deutsche Bank offered to cover any loss of value of the Solutia Bonds from February 4, 2004 through March 4, 2004.

NE:221856v1  8

44. Deutsche Bank spoke with JPM to confirm its trade with JPM just as Ambac Credit called Deutsche Bank to confirm the trade. This process lets both sides know that both parties recognize the trade and that the bonds will be delivered as soon as they are available.

45. It was improper for Ambac Credit to silently withdraw its instruction to receive the Solutia Bonds from Deutsche Bank and not so advise Deutsche Bank, essentially trying to avoid its obligation under the Confirmation in violation of the contract and the market practice described above.

46. On February 4, 2004, Deutsche Bank had $3,177,000 of the $8,771,000 principal amount of Solutia Bonds it needed to deliver to Ambac Credit. Deutsche Bank did not make a partial delivery of these Bonds to Ambac Credit because Ambac Credit did not request it.

47. Partial delivery of bonds is not the usual practice. In fact, the market practice is not to make a partial delivery of bonds unless the counter-party requests such a partial delivery.

48. The term "DKing" is a shorthand for "don't know." It is used by Deutsche Bank to indicate that there is an inconsistency between what one party knows and what the other counter-party knows. Generally, it means that there is a question about a transaction and the salesperson is checking to see if there has been an error.

49. Notwithstanding any note that Deutsche Bank was "DKing" JPM in connection with the Solutia Bonds, Deutsche Bank did not refuse delivery of the Solutia Bonds from JPM.

50. The document bates stamped DB1797 is a screen shot from one of Deutsche Bank's computer systems showing the settlement of $4 million principal amount of Solutia Bonds from JPM to Deutsche Bank that was delivered by JPM in two quantities on two different dates: $2,302,000 principal amount delivered on February 23, 2004 and $1,698,000 principal amount delivered on March 4, 2004.

51. The counter-party on the document bates stamped DB1797 is "EMGTCNY," which is a designation for Morgan Guaranty Trust Company of New York or JPM.

52. Towards the bottom of the document bates stamped DB1797 is the term "Quantity." The first entry under that heading shows that on February 23, 2004, $2,302,000 in Solutia Bonds were deposited into DTC2485, a Deutsche Bank account, from EMGTCNY (the abbreviation for JPM).

53. The second entry under the heading "Quantity" on the document bates stamped DB1797 shows that on March 4, 2004, $1,698,000 principal amount of Solutia Bonds were deposited into DTC2485, a Deutsche Bank account, from EMGTCNY.

54. The document bates stamped DB1799 is another screen shot from Deutsche Bank's computer systems. It shows that Deutsche Bank communicated with an individual named "Sandy" at JPM on February 9, 2004. Sandy informed Deutsche Bank that JPM was "CIN," which means "counter-party insufficient." In other words, as of February 9, 2004, JPM did not have sufficient Solutia Bonds to make delivery to Deutsche Bank. This screen shot further shows that "Settlement pending stock delivered" meaning that the settlement of this transaction is pending until the bonds [not stock] is delivered.

55. The document bates stamped DB1800 is another screen shot from Deutsche Bank's computer systems. It identifies "ECSFP" as the counterparty, which is an abbreviation for Credit Suisse Financial Products or CSFB. This screen shot further shows that $2,000,000 of Solutia Bonds were delivered into DTC2485, a Deutsche Bank account, by CSFB on March 2, 2004.

56. The document bates stamped DB1802 is another screen shot from Deutsche Bank's computer systems. It shows that on February 11, 2004, CSFB informed Deutsche Bank that they were "CIN" (counter-party insufficient), meaning that CSFB did not have sufficient Solutia Bonds to deliver to Deutsche Bank. This screen shot further states: "Settlement pending stock delivered," meaning that the settlement of this transaction was pending until the bonds were delivered.

57. Between January 1, 2000 and February 2, 2006 when my deposition was taken, I can think of at least three occasions on which bonds were delivered after the scheduled physical settlement date pursuant to a credit derivative transaction.

58. The first occasion involved the credit derivative transaction described above between Deutsche Bank and JPM in early 2004 concerning the Solutia Bonds. Deutsche Bank accepted the delivery of the Solutia Bonds from JPM after the scheduled settlement date for that credit derivative transaction pursuant to the market practice described above.

59. The second occasion involved a credit derivative transaction between Deutsche Bank and Bank of America in November 2005 concerning bonds issued by Delta Airlines. Deutsche Bank accepted delivery of the bonds from Bank of America after the scheduled physical settlement date pursuant to the market practice described above.

NE:221856v1                                11

60. I am aware of one situation in which Deutsche Bank delivered bonds in a credit derivative transaction after the scheduled physical settlement date. The counter-party on that occasion in early 2001 was Morgan Stanley and it involved bonds issued by Enron. The bonds were accepted by Morgan Stanley pursuant to the market practice described above.

61. Pursuant to the market practice described above, Deutsche Bank consistently has accepted delivery of the bonds in credit derivative transactions, even where the bonds are delivered after the scheduled physical settlement date. Similarly, other than the present case, Deutsche Bank's counterparties consistently have accepted delivery of the bonds from Deutsche Bank, even where Deutsche Bank has delivered the bonds after the scheduled physical settlement date, pursuant to the market practice described above.

62. Deutsche Bank's loss from Ambac's breach of contract is $4,955,615 plus interest. The $4,955,615 is $8,771,000 less $3,815,385, the market value for Solutia Bonds in the principal amount of $8,771,000 on March 4, 2004 (date Deutsche Bank tendered the Solutia Bonds to Ambac Credit) which were trading at 43.5% of par.

63. Exhibit 210 are Bloomberg Prices for the Solutia Bonds at issue in this case. These Bloomberg Prices are based on market trades, and are viewed by participants in the bond market as being an accurate source of bond pricing information.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 8th day of June, 2006 at New York, New York.